UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
JANINE RUBINSTEIN, *individually and on behalf of all others similarly situated*,

                     Plaintiff,               **MEMORANDUM & ORDER**
                                                   24-CV-1387 (PKC) (AYS)

        - against -

VIVID SEATS INC.,

                     Defendant.
-------------------------------------------------------x

PAMELA K. CHEN, United States District Judge:

      Plaintiff Janine Rubinstein ("Plaintiff" or "Rubinstein") filed her Class Action Complaint ("Complaint") in this district against Vivid Seats, LLC ("Defendant" or "Vivid Seats") on February 25, 2024, alleging violations of New York's Arts and Cultural Affairs Law ("ACAL") § 25.07(4). (Compl., Dkt. 1, ¶ 1.) On July 1, 2024, Plaintiff filed a Consolidated Class Action Complaint ("Consolidated Complaint"). (Consolidated ("Cons.") Compl., Dkt. 20.) Plaintiff brings this action on behalf of herself and all others similarly situated ("Putative Plaintiffs").[1] (*Id.* at 1.) Currently before the Court are Defendant's motions to compel arbitration and dismiss the Consolidated Complaint for lack of jurisdiction and failure to state a claim. (Def.'s Mot. to Compel Arbitration and Mot. to Dismiss ("Mot."), Dkt. 28.) For the reasons stated below, the Court grants Defendant's motion to compel arbitration, defers ruling on Defendant's motion to dismiss for lack of jurisdiction and failure to state a claim, and stays this action pending arbitration.

---

[1] No class has been certified.

## BACKGROUND

### I.    Factual Background[2]

The Putative Plaintiffs are New York individuals who purchased tickets to an event through Defendant's website, https://www.vividseats.com/ (the "Website"). (*See* Cons. Compl., Dkt. 20, ¶¶ 39–40.) Defendant is a Delaware limited liability company with its principal place of business in Chicago, Illinois. (*Id.* ¶ 11.) Defendant owns and operates the Website. (*Id.*)

#### A.    Defendant's Website

Individuals can purchase tickets to a range of events through the Website. (*Id.* ¶¶ 7–10 (discussing the nature of the events for which Putative Plaintiffs purchased tickets).) "When a prospective purchaser visits [the Website] to purchase a ticket to an event, they are initially prompted with ticket seating options and a corresponding price for each ticket." (*Id.* ¶ 17.) "The price shown at this stage of the purchase process makes no mention of any fees." (*Id.* ¶ 18.) "[A]fter purchasers make a seating selection, they are presented with a higher ticket price than originally shown, along with an added notation in fine print indicating an added fee," with "[n]o further details regarding the nature of the fee." (*Id.* ¶ 19.) Finally, after making a seat selection, "purchasers reach the order summary page where . . . for the first time in the multi-step purchase process, the purchaser is made aware that the added fee presented . . . is a 'Service' fee." (*Id.* ¶ 20.) The Website "offers no explanation of what the 'Service' fee is or what is provided to purchasers for paying this fee." (*Id.*)

---

[2] The Court takes the following from "all relevant, admissible evidence submitted by the parties" and "draw[s] all reasonable inferences in favor of the non-moving party." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (internal quotation marks and citations omitted).

2

B.  **Plaintiff's Ticket Purchase**

Plaintiff made the purchase at issue on the Website on August 2, 2023, when she bought eight tickets to a New York Mets baseball game. (Cons. Compl., Dkt. 20, ¶ 7.) Plaintiff proposes a class of Putative Plaintiffs who are "[p]urchasers of tickets through Defendant's [Website] who were subjected to a ticket sales process which violated ACAL." (*Id.* ¶ 38.)

C.  **The Website's Terms of Use**

When purchasing tickets on the Website as of the date of Plaintiff's purchase, all purchasers were required to click a pink button on the purchase page ("Purchase Page") of the Website that read "Place Order," as shown below:

> **Confirm and Place Order**
>
> By clicking "Place order", you agree to the Vivid Seats terms of use and to the Rewards Program terms and conditions and confirm that you are aware that you may be paying above face value for your tickets. Your credit card will be charged $85.31. All prices in US Dollars. All sales are final.
>
> [Place Order]

(Bakal Decl., Dkt. 29-1, ¶ 4.) The Purchase Page had a white background. (Def.'s Mem. Supp. Mot. ("Mem."), Dkt. 29, at 13.) Against this white background and directly above the pink "Place Order" button, the following message instructed the purchaser: "By clicking 'Place order[,'] you agree to the Vivid Seats terms of use." (Bakal Decl., Dkt. 29-1, ¶ 4.) "The phrase 'terms of use' appeared in the same pink color as the 'Place Order' button, and the phrase was hyperlinked to the terms of use . . . then in effect [("TOU")], so that the [TOU] would open in the customer's internet browser upon clicking on the phrase 'terms of use.'" (*Id.*) The Website design "did not allow [Plaintiff] to complete her August 2, 2023 ticket purchase unless she first clicked the 'Place Order' button directly below the message stating that, '[b]y clicking "Place Order[,"] you agree to the Vivid Seats terms of use' with a hyperlink to the [TOU]." (*Id.* ¶ 5.)

3

The TOU included several provisions relevant to Defendant's motion to compel arbitration. First, at the top of the TOU in capital, bolded letters was a provision notifying purchasers that the TOU "contain an arbitration and dispute resolution provision that requires you and [Defendant] to resolve disputes . . . by binding and exclusive arbitration instead of in a court or before a jury, unless you choose to timely opt out." (*Id.* at ¶ 6 (quoting TOU, Dkt. 29-1, at ECF[3] 7).) Second, in the same paragraph at the top of the TOU, it states: "In arbitration, a class, representative, or consolidated action or proceeding will not be permitted." (*Id.*) There is no evidence that Plaintiff has opted out of the arbitration and dispute resolution provision.

### D.     The ACAL

Pursuant to the ACAL,

> Every operator or operator's agent of a place of entertainment, any licensee or other ticket reseller, or platform that facilitates the sale or resale of tickets shall disclose the total cost of the ticket, inclusive of all ancillary fees that must be paid in order to purchase the ticket, and disclose in a clear and conspicuous manner the portion of the ticket price stated in dollars that represents a service charge, or any other fee or surcharge to the purchaser.  Such disclosure of the total cost and fees shall be displayed in the ticket listing prior to the ticket being selected for purchase.

N.Y. Arts & Cult. Aff. Law § 25.07(4).  "Defendant is a 'platform that facilitates the sale or resale of tickets.'" (Cons. Compl., Dkt. 20, ¶ 54 (quoting *id.*).)  Therefore, Plaintiff alleges, "Defendant had a statutory obligation to 'disclose the total cost of the ticket, inclusive of all ancillary fees that must be paid in order to purchase the ticket, and disclose in a clear and conspicuous manner the portion of the ticket price stated in dollars that represents a service charge, or any other fee or surcharge to the purchaser' at the first point that ticket prices are displayed on their website." (*Id.* ¶ 55 (quoting same).)  Plaintiff highlights that, pursuant to the New York Division of Licensing

---

[3] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

Services, "the ticket purchasing process begin[s] once a consumer visits a ticket marketplace and first sees a list of seat prices." (Pl.'s Opp'n to Mot. ("Opp'n"), Dkt. 31, at 2 (quoting N.Y. State Div. of Licensing Servs. (Oct. 24, 2022)[4]) (altered to match original).) "From the moment the prospective purchaser assesses the . . . ticket lists . . .[,] there should be no price increases to the purchaser for the ticket itself." (*Id.* (quoting same).)

According to Plaintiff, Defendant violated the ACAL because the total cost of tickets, inclusive of fees, "was not disclosed to Plaintiff[] at the beginning of the purchase process," i.e., when Plaintiff first viewed the available tickets for purchase and before Plaintiff selected any given ticket(s). (Cons. Compl., Dkt. 20, ¶ 60 (discussing lack of disclosure); Opp'n, Dkt. 31, at 3 (discussing timing).) Therefore, Defendants allegedly failed to disclose the applicable service fees before the tickets were selected for purchase as required by the ACAL, "increas[ed] the total cost of its tickets during the purchase process," and failed to conspicuously disclose the portion of the ticket price that represented a service charge. (Cons. Compl., Dkt. 20, ¶¶ 55–58.) Plaintiff contends that this is in direct contrast to other ticket sellers' websites, where fees are presented "as soon as a purchaser is prompted to select their ticket type." (*Id.* ¶¶ 28–29.)

## II. Procedural History

As explained, Plaintiff filed the original Complaint on behalf of herself and all others similarly situated on February 25, 2024. (Compl., Dkt. 1.) On May 6, 2024, Defendant notified the Court of another, later-filed "copycat" case against Defendant in the Southern District of New

---

[4] *See* Letter from N.Y. State Div. of Licensing Servs., to Redacted, re: Request for Additional Guidance – New York State Senate Bill S.9461 (Oct. 24, 2022), https://dos.ny.gov/system/files/documents/2023/06/response-letter-redacted.pdf.

5

York ("SDNY case"),[5] which Defendant was in the process of transferring to this district. (Def. Ltr., Dkt. 14, at 1.) After Defendant's transfer motion in that case was granted on May 20, 2024, (*see* Mot. to Consolidate, Dkt. 17, at 1 (discussing transfer motion in SDNY case)), the Court consolidated the SDNY case into the instant case, (6/10/2024 Dkt. Order.) Accordingly, the Consolidated Complaint was filed on July 1, 2024. (Cons. Compl., Dkt. 20.)

Given the consolidation, the plaintiffs in the Consolidated Complaint included Rubinstein as well as Amy Zainfeld ("Zainfeld"), Abraham Davies ("Davies"), and Lowell Kern ("Kern"). (*Id.* at 1.) Upon Defendant's request, the Court held a pre-motion conference regarding Defendant's proposed motion to dismiss on August 28, 2024. (8/28/2024 Min. Entry.) During the conference, the Court held that it would "de-consolidate the *Rubinstein* (No. 24-cv-1387) and *Zainfeld* (No. 24-cv-3879) actions, and [that] the *Zainfeld* action (including named Plaintiffs . . . Zainfeld, . . . Kern, and . . . Davies) [would] be dismissed." (*Id.*) On September 3, 2024, the cases were de-consolidated, Plaintiffs Zainfeld, Kern, and Davies were dismissed, and the *Zainfeld* action remained closed. (9/3/2024 Dkt. Order.) Rubinstein, as well as the Putative Plaintiffs she represents,[6] remained in the original, instant action. (*See* 8/28/2024 Min. Entry.) Thus, the Consolidated Complaint remains the operative complaint, with Rubinstein as the sole named plaintiff.

On behalf of the Putative Plaintiffs, Plaintiff "seek[s] to enjoin the unlawful acts and practices described [within the Consolidated Complaint], to recover actual damages or fifty

---

[5] The case was docketed as *Zainfeld et al. v. Vivid Seats, LLC*, No. 24-CV-1520 (DEH) (S.D.N.Y. transferred May 20, 2024).

[6] Following the August 28, 2024 conference, "any allegations related to the proposed subclass of individuals who reside in New York State but bought tickets to events outside of New York State [were] stricken from the Consolidated Complaint." (8/28/2024 Min. Entry.)

6

dollars, whichever is greater, and reasonable attorneys' fees." (Cons. Compl., Dkt. 20, ¶ 63.) She also "seek[s] judgment against Defendant" for: (a) "an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff[] as representative of the Class and Plaintiff[]' attorneys as Class Counsel to represent the Class"; (b) "an order declaring that Defendant's conduct violates the statute referenced in the [Consolidated Complaint]"; (c) "an order finding in favor of Plaintiff[] and the Class"; (d) "compensatory and statutory damages in amounts to be determined"; (e) "pre[-]judgment interest on all amounts awarded"; (f) "an order of restitution and all other forms of equitable monetary relief"; and (g) "injunctive relief as pleaded or as the Court may deem proper." (*Id.* at 19.) Finally, Plaintiff asserts that "the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs." (*Id.* ¶ 12.)

On September 12, 2024, Defendant served its motions on Plaintiff. (Dkt. 26; *see* Mem., Dkt. 29.) On October 15, 2024, Plaintiff served her Opposition to Defendant's motions. (Dkt. 27; *see* Opp'n, Dkt. 31.) On October 29, 2024, Defendant served its Reply on Plaintiff, at which point the motion was fully briefed. (Mot., Dkt. 28; *see* Reply, Dkt. 30.[7])

## DISCUSSION

The Court first decides Defendant's motion to compel arbitration before considering its motion to dismiss.[8] *See Kaiser v. StubHub, Inc.*, No. 24-CV-0044 (JLR), 2024 WL 3445059,

---

[7] Defendant also submitted supplemental authority in support of its motion: a December 17, 2024 Order issued by District Judge Analisa Torres in *Kern et al. v. StubHub, Inc.*, No. 24-CV-0871 (S.D.N.Y. 2024), (Dkt. 32); and a January 17, 2025 Order by District Judge Natasha Merle in *Vasell et al. v. SeatGeek, Inc.*, No. 24-CV-0932 (E.D.N.Y. 2025), (Dkt. 33).

[8] Defendant's motion to dismiss, including for lack of subject matter jurisdiction, is brought in the alternative to its motion to compel arbitration, and is premised on the Court finding, as Plaintiff argues, that Plaintiff's claim arose prior to and separate from her assent to the applicable arbitration agreement. (*See* Mem., Dkt. 29, at 19–21, 25; Opp'n, Dkt. 31, at 1.) Because the Court finds Plaintiff's claim subject to the arbitration agreement and grants Defendant's motion to

7

at *3 (S.D.N.Y. July 17, 2024) (noting that "the Court 'should generally rule on a motion to compel arbitration before proceeding to a merits-based motion to dismiss'" (quoting *Harris v. TD Ameritrade Inc.*, 338 F. Supp. 3d 170, 181 (S.D.N.Y. 2018), *aff'd*, 837 F. App'x 841 (2d Cir. 2021) (summary order)).

**I.      Motion to Compel Arbitration**

    **A.      Legal Standard**

The Federal Arbitration Agreement (the "FAA") reflects "a liberal federal policy favoring arbitration agreements." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 346 (2011) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)). Pursuant to the FAA, "courts must place arbitration agreements on an equal footing with other contracts . . . and enforce them according to their terms." *Id.* (internal citations omitted). "As a result, arbitration agreements are 'valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *Coinbase, Inc. v. Suski*, 602 U.S. 143, 147–48 (2024) (quoting 9 U.S.C. § 2). "The threshold question facing any court considering a motion to compel arbitration is . . . whether the parties have indeed agreed to arbitrate." *Doctor's Assocs., Inc. v. Alemayehu*, 934 F.3d 245, 250 (2d Cir. 2019) (quoting *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 118 (2d Cir. 2012)). "If a court is 'satisfied that the making of the agreement for arbitration . . . is not in issue,' it must send the dispute to an arbitrator." *Coinbase*, 602 U.S. at 148 (quoting 9 U.S.C. § 4).

"In deciding a motion to compel arbitration, courts apply a 'standard similar to that applicable for a motion for summary judgment.'" *Cooper v. Ruane Cunniff & Goldfarb Inc.*, 990

---

compel arbitration, *see supra*, it declines to consider Defendant's alternative arguments regarding Plaintiff's alleged lack of standing at this time, (*see* Mem., Dkt. 29, at 19–21).

8

F.3d 173, 179–80 (2d Cir. 2021) (quoting *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016)). "The summary judgment standard requires a court to 'consider all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits'" and to "draw all reasonable inferences in favor of the non-moving party." *Nicosia*, 834 F.3d at 229 (first quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 155 (2d Cir. 2002); and then citing *Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 171–72 (2d Cir. 2011)). "The party seeking to compel arbitration bears an initial burden of demonstrating that an agreement to arbitrate was made." *Hu v. Whaleco, Inc.*, 779 F. Supp. 3d 265, 277 (E.D.N.Y. 2024) (quoting *Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th 95, 101–02 (2d Cir. 2022)). "This burden . . . require[s] the moving party to show . . . only that an agreement to arbitrate existed." *Zachman*, 49 F.4th at 102. If the moving party establishes the existence of an agreement to arbitrate, "the burden shifts to the party 'seeking to avoid arbitration . . . [to show] the agreement to be inapplicable or invalid.'" *Hu*, 779 F. Supp. 3d at 277 (quoting *Harrington v. Atl. Sounding Co.*, 602 F.3d 113, 124 (2d Cir. 2010)).

    **B.    Application**

"Arbitration is a matter of contract and consent, and . . . disputes are subject to arbitration if, and only if, the parties actually agreed to arbitrate those disputes." *Coinbase*, 602 U.S. at 145. "Courts consider two factors when deciding if a dispute is arbitrable: '(1) whether the parties agreed to arbitrate, and, if so, (2) whether the scope of that agreement encompasses the claims at issue.'" *Cooper*, 990 F.3d at 179 (quoting *Holick v. Cellular Sales of N.Y., LLC*, 802 F.3d 391, 394 (2d Cir. 2015)). Courts "resolve any doubts concerning the scope of arbitrable issues 'in favor of arbitrability.'" *Daly v. Citigroup Inc.*, 939 F.3d 415, 421 (2d Cir. 2019) (citing *State of New York v. Oneida Indian Nation of N.Y.*, 90 F.3d 58, 61 (2d Cir. 1996)). "In so doing, [courts] will

9

compel arbitration unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Id.* (internal quotations and citation omitted).

1. Whether There is an Arbitration Agreement

"The preliminary question of whether [p]laintiffs assented to the [relevant agreement], and therefore to the arbitration clause[], is a matter for the [c]ourt to decide." *Kai Peng v. Uber Techs., Inc.*, 237 F. Supp. 3d 26, 45 (E.D.N.Y. 2017). "[W]hether [an arbitration] agreement exists between the parties . . . is determined by state contract law." *Meyer*, 868 F.3d at 73–74 (internal citation omitted). Here, Defendant contends that Illinois law governs pursuant to the arbitration agreement. (Mem., Dkt. 29, at 9 (citing TOU, Dkt. 29-1, at ECF 19)[9].) Plaintiff does not contest this. (*See generally* Opp'n, Dkt. 31.) Regardless, Illinois and New York law "are consistent on all material matters concerning contract formation," and "the validity of the arbitration provisions does not depend on" which state law is applied. *Behrens v. JPMorgan Chase Bank N.A.*, No. 16-CV-5508 (VSB), 2019 WL 1437019, at *11 n.14 (S.D.N.Y. Mar. 31, 2019), *aff'd*, No. 21-CV-2603, 2024 WL 1090856 (2d Cir. Mar. 13, 2024) (summary order). "To form an enforceable contract in the online context, 'Illinois contract law requires that a website provide a user reasonable notice that [their] use of the site or click on a button constitutes assent to an agreement.'" *Melvin v. Big Data Arts, LLC*, 553 F. Supp. 3d 447, 449 (N.D. Ill. 2021) (quoting *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1036 (7th Cir. 2016)).

---

[9] As Defendant points out, "'[a] federal court sitting in diversity applies the choice-of-law rules of the forum state[,]' which, here, is New York." (Mem., Dkt. 29, at 9 n.6 (quoting *Maryland Cas. Co. v. Cont'l Cas. Co.*, 332 F.3d 145, 151 (2d Cir. 2003)).) "Under New York choice-of-law rules, contractual choice-of-law provisions generally are enforceable." (*Id.* (first citing *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 556 (2d Cir. 2000); and then citing *OneWest Bank, FSB v. Joam LLC*, No. 10-CV-1063 (JG) (SMG), 2012 WL 195013, at *5 (E.D.N.Y. Jan. 23, 2012)).)

The parties do not dispute that an agreement to arbitrate was formed once Plaintiff assented to Defendant's TOU and conducted her purchase. (*See* Opp'n, Dkt. 31, at 7–8 (drawing distinction between Plaintiff's claim and the arbitration agreement, without disavowing the agreement); Reply, Dkt. 30, at 1 (noting that "Plaintiff concede[d] that she and Vivid Seats entered into a valid and enforceable Arbitration Provision").) The Court therefore declines to analyze whether an arbitration agreement was formed and instead focuses its analysis on the second factor: whether this agreement encompasses Plaintiff's claim such that it must be arbitrated.

### 2. Scope of the Arbitration Agreement

The question of whether the applicable arbitration agreement encompasses Plaintiff's claim is guided by "[o]rdinary principles of contract law." *Loc. Union 97, Int'l Bhd. of Elec. Workers, AFL-CIO v. Niagara Mohawk Power Corp.*, 67 F.4th 107, 113 (2d Cir. 2023) (collecting cases). "If the allegations underlying the claims touch matters covered by" the arbitration clause, "then those claims must be arbitrated, whatever the legal labels attached to them." *Holick*, 802 F.3d at 395 (quoting *Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l*, 198 F.3d 88, 99 (2d Cir. 1999)). As "the party resisting arbitration, [Plaintiff] bears the burden of showing that the parties' arbitration clause does *not* encompass the claims at issue." *Car Wash Advisory LLC v. May*, No. 24-CV-8679 (JMF), 2025 WL 1580877, at *1 (S.D.N.Y. June 4, 2025).

Under the TOU, the parties agreed (subject to exceptions not applicable here) to arbitrate "*any and all* disputes, controversies, or claims *arising out of or relating in any way* to: (i) these Sales Terms; (ii) your use of, or access to, the site; (iii) Vivid Seats' services; [and] (iv) any tickets or other items sold or purchased through the site." (TOU, Dkt. 29-1, at ECF 18–19 (emphasis added).) Plaintiff argues that her claim arose out of Defendant's pre-agreement conduct, i.e., before Plaintiff accepted the TOU, and that "the arbitration agreement does not . . . apply retroactively to cover statutory violations that already occurred and claims that already existed

11

before any terms were even presented." (Opp'n, Dkt. 31, at 7–8.) Defendant counters that the TOU's "arbitration provision covers all claims within the substantive scope of the provision—regardless of when the claims arose—unless the provision is expressly limited to a particular time period." (Reply, Dkt. 30, at 1.)

Under both Seventh and Second Circuit precedent,[10] the TOU's expansive language must be enforced according to the terms of the agreement. *See Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 178 (2019) ("The [FAA] requires courts to enforce arbitration agreements according to their terms." (citing 9 U.S.C. § 2)). And, indeed, courts regularly decline to temporally limit otherwise expansive arbitration clauses. *Domer v. Menard, Inc.*, 116 F.4th 686, 700–01 (7th Cir. 2014) (explaining that "[t]he 'arising out of or relating to' language is an 'expansive' clause," and that "[c]ourts may not imply limitations or engraft additional terms that the parties did not include in their agreement" (citations omitted); *Holick*, 802 F.3d at 397 (noting that "broad arbitration provisions that contain no express temporal limitation can apply to claims that arose prior to the execution of the arbitration agreement" (citing *Coenen v. R.W. Pressprich & Co.*, 453 F.2d 1209 (2d Cir. 1972)); *see Kutluca v. PQ N.Y. Inc.*, 266 F. Supp. 3d 691, 703–04 (S.D.N.Y. 2017) ("[T]he weight of authority supports applying broad arbitration provisions retroactively where they do not contain temporal limitations." (collecting cases)); *Calderon v. Breadberry Inc.*, No. 22-CV-1601 (MKB) (LB), 2023 WL 1861639, at *4 (E.D.N.Y. Feb. 9, 2023) ("Where the arbitration agreement

---

[10] Because the Court's assessment is guided by "[o]rdinary principles of contract law," *Loc. Union 97*, 67 F.4th at 113, the Court considers first Seventh Circuit precedent interpreting Illinois law, as provided by the arbitration agreement's choice-of-law provision, (*see* TOU, Dkt. 29-1, at ECF 19). However, as the laws of Illinois and New York "are consistent on all material matters concerning contract formation," *Behrens*, 2019 WL 1437019, at *11, the Court also considers Second Circuit precedent interpreting New York law.

'does not contain any temporal limitation,' the relevant question is whether the claims relate to any obligation under the agreement, 'not when they arose.'" (collecting cases)).

Here, the TOU expressly cover the "Sales Terms," the purchaser's "use of, or access to, the site," "Vivid Seats' services," and "any tickets or other items sold or purchased through the site," without any temporal limitation. (TOU, Dkt. 29-1, at ECF 18.) While this arbitration clause is admittedly broad, the Court declines to "imply . . . or engraft additional terms" that would artificially limit its scope. Thus, the TOU's arbitration clause applies retroactively, and it fully encompasses Plaintiff's claim.

Plaintiff pushes back by leveraging *Holick*, a Second Circuit decision. (Opp'n, Dkt. 31, at 6–7.) To be sure, in *Holick*, the court refused to compel the arbitration of claims that arose before the arbitration agreement at issue there began. 802 F.3d at 399. But the *Holick* court declined to retroactively apply the arbitration provision to pre-agreement claims not because these pre-dated the *agreement*, but rather because they predated the *employment* that explicitly "temporally limited" the arbitration clause. *Id.* at 398. Indeed, in *Holick*, the arbitration provision was part of an employment agreement that "changed" "the parties' contractual positions." *Id.* Because the arbitration provision explicitly applied to the plaintiffs' "employment" only, it did not apply to claims arising when the plaintiffs were "independent contractors"—i.e. before the agreement was signed. *Id.* Here, Plaintiff makes no allegation that her contractual position vis-à-vis Defendant changed in any way contemplated by the TOU's arbitration provision; rather, the TOU expressly contemplated the precise contractual relationship that existed between Plaintiff and Defendant, that of ticket purchaser and ticket seller. Before and after Plaintiff agreed to the TOU, she made "use of, or [had] access to, the [Website]" and her complaint relates to "Sales Terms," "Vivid Seats' services," and "tickets . . . purchased through the [Website]." (TOU,

13

Dkt. 29-1, at ECF 18.) Plaintiff's reliance on *Holick* is therefore unavailing, and she otherwise fails to identify any other Second or Seventh Circuit case law in support of her position.[11]

Plaintiff also points to arbitration agreements in other websites to support her argument that the TOU arbitration clause should not be applied to her complaint about Defendant's pre-agreement conduct. She argues: "Terms of use that are intended or meant to apply to pre-agreement conduct say so, explicitly. For example, by comparison, other similar websites specify that their terms of use apply to claims arising out of pre-agreement conduct." (Opp'n, Dkt. 31, at 5.) According to Plaintiff, at least five "similar websites" explicitly state that their arbitration provisions "include[] any Claims that arose before [the consumer] accepted these [t]erms and [c]onditions." (*Id.* (quoting competitor's arbitration clause).) One such website is Defendant's competitor, SeatGeek, which "updated its terms of use to include claims arising out of pre-agreement conduct." (*Id.* at 6.) Even accepting Plaintiff's factual assertions regarding other websites, these do not undercut Second and Seventh Circuit precedent upholding the retroactive application of arbitration clauses absent temporal limitations.[12] Thus, Plaintiff's factual comparisons fail to meet the burden she bears in seeking to avoid arbitration.

### C. Delegation Clause

Even if the Court were not satisfied that Plaintiff's claim falls under the arbitration provision, the TOU also include a delegation clause that requires such a dispute over the scope of

---

[11] (*See* Opp'n, Dkt. 31, at 6–7 (citing Fifth, Ninth, and Tenth Circuit caselaw in support of Plaintiff's position regarding the scope of the arbitration agreement).)

[12] Plaintiff also points to Defendant's subsequent inclusion of similar language explicitly including "pre-agreement conduct" in their later terms to show that "the absence of that language in prior versions of the [terms] did not cover claims that arose from pre-agreement conduct." (*Id.* at 8.) But Plaintiff fails to provide the Court with any *legal* support for this fact-based conclusion. The Court is also wary of the potential negative policy implications of penalizing website-based businesses like Defendant from updating their terms as circumstances require.

the arbitration agreement itself to be arbitrated.  (TOU, Dkt. 29-1, at ECF 19 ("Delegation: The arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute arising out of or relating to the formation, existence, scope, validity, interpretation, applicability, or enforceability of this agreement to arbitrate, or any part of it.").) "In cases where parties have agreed to" a contract that "contains an arbitration clause with a delegation provision, then, absent a successful challenge to the delegation provision, courts must send all arbitrability disputes to arbitration." *Coinbase*, 602 U.S. at 152; *see Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 65 (2019) ("When the parties' contract delegates the arbitrability question to an arbitrator, the courts must respect the parties' decision as embodied in the contract."); *see also Hu*, 779 F. Supp. 3d at 297 ("When a delegation clause exists, a court may not disturb the parties' delegation unless a party directly challenges the delegation clause itself." (collecting cases)); *Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454, 470 (S.D.N.Y. 2017) ("Parties may delegate issues of arbitrability, such as the scope of the arbitration, to arbitrators so long as that delegation is clear and unmistakable." (first citing *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 79 (2010); and then citing *Contec Corp. v. Remote Sol., Co.*, 398 F.3d 205, 211 (2d Cir. 2005)).  Here, the TOU's delegation clause is "clear and unmistakable." *Applebaum*, 263 F. Supp. 3d at 470.  Plaintiff has provided no argument to the contrary.

Therefore, even if the Court were not convinced, which it is, that Plaintiff's claim must be arbitrated, Plaintiff's claim would still have to go before the arbitrator to determine arbitrability.

### D. Presumption of Arbitrability

Assuming that there remained any ambiguity as to the scope of the arbitration provision *and* the effect of the delegation clause, the Court would still compel arbitration pursuant to the established "presumption of arbitrability." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561

15

U.S. 287, 302 (2010); *see Holick*, 802 F.3d at 395 ("[I]n light of the strong federal policy in favor of arbitration, the existence of a broad agreement to arbitrate creates a presumption of arbitrability which is only overcome if it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." (quoting *Smith/Enron*, 198 F.3d at 99); *see also Gorny v. Wayfair Inc.*, No. 18-CV-8259 (MFK), 2019 WL 2409595, at *3 (N.D. Ill. June 7, 2019) ("[O]nce it is clear . . . that the parties have a contract that provides for arbitration of some issues between them, any doubt concerning the scope of the arbitration clause is resolved in favor of arbitration as a matter of federal law." (quoting *Gore v. Alltel Commc'ns, LLC*, 666 F.3d 1027, 1032 (7th Cir. 2012))).

### E.  Class Certification for Arbitration

Finally, Defendant requests that the Court compel arbitration on a non-class basis. (Mem., Dkt. 29, at 18.) "[A] party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 684 (2010). Where an arbitration agreement includes a class action waiver, courts have upheld the latter. *Concepcion*, 563 U.S. at 352 (striking down California's judicial rule that had held class action waivers in arbitration clauses unconscionable and finding that California's rule was preempted by the FAA); *Horton v. Dow Jones & Co., Inc.*, 804 F. App'x 81, 84–85 (2d Cir. 2020) (summary order) (upholding a class-waiver provision in a subscription agreement); *Vasell v. SeatGeek, Inc.*, No. 24-CV-0932 (NCM) (JRC), 2025 WL 240912, at *10 (E.D.N.Y. Jan. 17, 2025) ("enforcing class action waiver because '[u]nder New York law, a contractual proscription against class actions is neither unconscionable nor violative of public policy'" (quoting *Tsadilas v. Providian Nat. Bank*, 786 N.Y.S.2d 478, 480 (1st

16

Dep't 2004)); *see also Brown v. Luxottica Retail N. Am. Inc.*, No. 09-CV-7816 (JBG), 2010 WL 3893820, at *6 (N.D. Ill. Sep. 29, 2010) (declining to hold a class action waiver "unconscionable" without "considerable specific factual evidence").

Defendant argues that "Plaintiff's [Consolidated] Complaint is barred by the arbitration agreement and class action waiver[13] to which Plaintiff agreed when using [the Website] and making her purchase." (Mem., Dkt. 29, at 1.)  Plaintiff does not seem to dispute this. (*See* Opp'n, Dkt. 31, at 1 (stating that "Plaintiff did not agree to the arbitration provision prior to Defendant's violation of ACAL" without contesting Plaintiff's agreement to the *class action waiver*).)  Given the established precedent upholding the waiver, and the absence of any express opposition by Plaintiff, the Court compels arbitration of Plaintiff's claim on a non-class basis.

## II.     Motion to Dismiss Under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6)

Defendant also requests that the Court dismiss Plaintiff's "Complaint for lack of standing and for failure to state claim." (Mem., Dkt. 29, at 1.)  Instead, the Court considers a stay more appropriate, given that this matter will be arbitrated. *See Vasell*, 2025 WL 240912, at *15 ("Stay, as opposed to dismissal, of a case referred to arbitration 'is consistent with the FAA's underlying policy to move the parties to an arbitrable dispute out of court and into arbitration as quickly and

---

[13] The class action waiver reads: "To the fullest extent permitted by applicable law, you and Vivid Seats each agree that any proceeding to resolve any dispute, claim, or controversy will be brought and conducted ONLY IN THE RESPECTIVE PARTY'S INDIVIDUAL CAPACITY AND NOT AS PART OF ANY CLASS . . . .  If the dispute is subject to arbitration, THE ARBITRATOR WILL NOT HAVE AUTHORITY TO COMBINE OR AGGREGATE CLAIMS, CONDUCT A CLASS ACTION, OR MAKE AN AWARD TO ANY PERSON OR ENTITY NOT A PARTY TO THE ARBITRATION.  Further, you and Vivid Seats agree that THE ARBITRATOR MAY NOT CONSOLIDATE PROCEEDINGS OR MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A CLASS ACTION." (TOU, Dkt. 29-1, at ECF 22; *see also id.* at ECF 7 ("IN ARBITRATION, A CLASS, REPRESENTATIVE, OR CONSOLIDATED ACTION OR PROCEEDING WILL NOT BE PERMITTED.").)

as easily as possible . . . unencumbered by the uncertainty and expense of additional litigation.'" (quoting *Katz v. Cellco P'ship*, 794 F.3d 341, 346 (2d Cir. 2015))). Indeed, "the dismissal of an arbitrable matter would convert the decision into an appealable order, thus controverting" that same FAA policy. *Plazza v. Airbnb, Inc.*, 289 F. Supp. 3d 537, 560 (S.D.N.Y. 2018) (citing same). Defendant has not requested a stay, but this does not preclude the Court from ordering it. *See id.* at 559–60 (finding a stay rather than dismissal appropriate, despite defendant's request for dismissal); *Zambrano v. Strategic Delivery Sols., LLC*, No. 15-CV-8410 (ER), 2016 WL 5339552, at *10 (S.D.N.Y. Sep. 22, 2016) (finding that, where the defendants sought a dismissal rather than a stay, the court had discretion to decide whether to stay or dismiss and stayed the action based on *Katz*). Ultimately, "[w]here the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, [a court] may rule on the basis of that legal issue and avoid the need for further court proceedings." *Kai Peng*, 237 F. Supp. 3d at 44–45 (first alteration added) (quoting *Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 172 (2d Cir. 2011)).

18

## CONCLUSION

Accordingly, Defendant's motion to compel arbitration is GRANTED, and these proceedings are stayed pending arbitration of Plaintiff's claim on a non-class basis. To be clear, even though the Court finds that there is a presumption of arbitrability and that the arbitration clause in this case requires that arbitrability be decided by the arbitrator, the Court is granting Defendant's motion on the basis that Plaintiff's claim is subject to arbitration under the TOU. The Court declines to rule on Defendant's motion to dismiss for lack of subject matter jurisdiction and failure to state a claim. The parties are directed to inform the Court of any resolution of the arbitration proceedings, or any other event, that would affect the stay of this matter.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: September 29, 2025
       Brooklyn, New York